## No. 21-60771

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

LaRenda J. Harrison, Ed. D.,

Plaintiff-Appellant,

v.

Brookhaven School District, City of Brookhaven,

Defendant-Appellee.

On Appeal from a Final Judgment of the
United States District Court for the Southern District of Mississippi
Case No. 5:20-cv-00136, Hon. Taylor B. McNeel

## OPENING BRIEF OF PLAINTIFF-APPELLANT LARENDA J. HARRISON

Keith L. Gates
655 Wendover Way
Ridgeland, MS 39157

Brian Wolfman
Madeline Meth
GEORGETOWN LAW APPELLATE
 COURTS IMMERSION CLINIC
600 New Jersey Ave., NW,
 Suite 312
Washington, D.C. 20001
(202) 661-6582
wolfmanb@georgetown.edu

Counsel for Plaintiff-Appellant LaRenda J. Harrison

December 8, 2021

No. 21-60771

LaRenda J. Harrison, Ed. D.,

Plaintiff-Appellant,

v.

Brookhaven School District, City of Brookhaven,

Defendant-Appellee.

**Certificate of Interested Persons**

Undersigned counsel certifies that the following persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

Plaintiff-Appellant

LaRenda J. Harrison, Ed. D.

Defendant-Appellee

Brookhaven School District, City of Brookhaven

Keith L. Gates

Georgetown Law Appellate Courts Immersion Clinic

Brian Wolfman

Madeline Meth

Jackson Lewis, P.C.

Susan Fahey Desmond

Sarah Katelyn Harrell

December 8, 2021                         /s/ Brian Wolfman
                                         Brian Wolfman

                                         Counsel for Plaintiff-Appellant

## Statement Regarding Oral Argument

Oral argument would aid this Court in addressing the issues raised by this appeal. This appeal concerns which discriminatory employment practices are prohibited by Title VII and 42 U.S.C. § 1981, an issue that arises frequently and continues to vex the lower courts.

Here, Plaintiff-Appellant Dr. LaRenda Harrison, an African-American woman, maintains that Defendant-Appellee Brookhaven School District refused to pay the costs of her professional training because of her race and sex while paying those same costs for similarly situated white and male employees. Ruling on the school district's motion for judgment on the pleadings, the district court held that, even if motivated by race or sex discrimination, the school district's alleged conduct is not prohibited by Title VII and Section 1981. Oral argument would help this Court decide whether the district court erred in arriving at that conclusion.

# Table of Contents

Certificate of Interested Persons ............................................................. i

Statement Regarding Oral Argument ..................................................... iii

Table of Authorities ............................................................................... v

Introduction ........................................................................................... 1

Jurisdictional Statement ........................................................................ 2

Issue Presented ...................................................................................... 2

Statement of the Case ........................................................................... 3

    A.   Factual allegations ..................................................................... 3

    B.   Dr. Harrison's suit and the decision below ............................... 6

Standard of Review ............................................................................... 8

Summary of Argument .......................................................................... 8

Argument .............................................................................................. 10

    On the facts pleaded, the school district discriminated against
    Dr. Harrison because of her race and sex with respect to the
    "compensation, terms, conditions, or privileges" of her
    employment in violation of Title VII and Section 1981. .......... 10

    A.   Dr. Harrison has alleged violations of Title VII and Section
        1981 consistent with those statutes' ordinary meaning and
        applicable tools of statutory construction. ......................... 10

    B.   Dr. Harrison's discrimination claims are actionable under
        this Court's precedent concerning training and employee
        compensation. ................................................................... 19

Conclusion ............................................................................................ 27

Certificate of Service ...........................................................................

Certificate of Compliance ....................................................................

# Table of Authorities

**Cases**                                                            **Page(s)**

*Advertiser's Mfg. Co.,*
    280 NLRB 1185 (1986), *enforced*, 823 F.2d 1086 (7th Cir. 1987)..................15

*Alvarado v. Tex. Rangers,*
    492 F.3d 605 (5th Cir. 2007).............................................................9, 21, 22, 23

*Benningfield v. City of Hous.,*
    157 F.3d 369 (5th Cir. 1998)................................................................8, 25, 26

*Bing v. Roadway Express, Inc.,*
    485 F.2d 441 (5th Cir. 1973)............................................................................19

*Brooks v. Firestone Polymers, LLC,*
    640 F. App'x 393 (5th Cir. 2016) (per curiam)........................................9, 20

*Burlington N. & Santa Fe Ry. Co. v. White,*
    548 U.S. 53 (2006).............................................................................................11

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,*
    140 S. Ct. 1009 (2020)......................................................................................16

*Edionwe v. Bailey,*
    860 F.3d 287 (5th Cir. 2017)..........................................................................3, 8

*F & R Meat Co.,*
    296 NLRB 759 (1989).......................................................................................15

*Ferguson v. Takata Seat Belts, Inc.,*
    2008 U.S. Dist. LEXIS 88416 (W.D. Tex. Oct. 21, 2008) .................................7

*Fierros v. Tex. Dep't of Health,*
    274 F.3d 187 (5th Cir. 2001).....................................................................26, 27

*Fyfe v. City of Fort Wayne,*
    241 F.3d 597 (7th Cir. 2001)................................................8, 24, 25

*Gines v. D.R. Horton, Inc.,*
    699 F.3d 812 (5th Cir. 2012)................................................8

*Goodman Inv. Co.,*
    292 NLRB 340 (1989)......................................................15

*Gruma Corp.,*
    350 NLRB 336 (2007)......................................................14

*Harris v. Forklift Sys., Inc.,*
    510 U.S. 171 (1993).........................................................18

*Hishon v. King & Spalding,*
    467 U.S. 69 (1984)................................................11, 12, 14, 24

*Johnson v. PRIDE Indus., Inc.,*
    7 F.4th 392 (5th Cir. 2021)..................................................10

*Landgraf v. USI Film Prods.,*
    511 U.S. 244 (1994).........................................................18

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973)..........................................................1

*Meritor Sav. Bank, FSB v. Vinson,*
    477 U.S. 57 (1986)..........................................................11

*Microimage Display Div. of Xidex Corp. v. NLRB,*
    924 F.2d 245 (D.C. Cir. 1991).......................................... 14-15

*Mid-South Bottling Co.,*
    287 NLRB 1333 (1988), *enforced,* 876 F.2d 458 (5th Cir. 1989)....................15

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002) ............................................................................13

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) ..............................................................................11

*Patterson v. McLean Credit Union,*
    491 U.S. 164 (1989) ...............................................................15, 16, 17

*Pegram v. Honeywell, Inc.,*
    361 F.3d 272 (5th Cir. 2004) .................................................................7

*Public Service Company of New Mexico,*
    364 NLRB No. 86 (2016) ....................................................................14

*Randall, Div. of Textron, Inc. v. NLRB,*
    687 F.2d 1240 (8th Cir. 1982) ............................................................14

*Rubinstein v. Admin'rs of the Tulane Educ. Fund,*
    218 F.3d 392 (5th Cir. 2000) ..............................................................26

*Runyon v. McCrary,*
    427 U.S. 160 (1976) ............................................................................16

*Shackelford v. Deloitte & Touche, LLP,*
    190 F.3d 398 (5th Cir. 1999) ..............................................................20

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ............................................................................13

*St. Francis Hosp.,*
    263 NLRB 834 (1982) .........................................................................15

*Success Village Apartments, Inc.,*
    347 NLRB 1065 (2006) .......................................................................15

*Threat v. City of Cleveland,*
    6 F.4th 672 (6th Cir. 2021)................................................................11

*United States v. Maturino,*
    887 F.3d 716 (5th Cir. 2018)............................................................10

*Virginia Mason Hospital,*
    357 NLRB 564 (2011).......................................................................14

*Wendt Corp.,*
    369 NLRB No. 135 (2020) ...............................................................14

**Statutes**

28 U.S.C. § 1291....................................................................................2

28 U.S.C. § 1331 ...................................................................................2

28 U.S.C. § 1343....................................................................................2

29 U.S.C. § 158(a)(3) ..........................................................................14

29 U.S.C. § 158(d) ...............................................................................14

42 U.S.C. § 1981.........................................................................1, 6, 15

42 U.S.C. § 1981(a).......................................................................2, 8, 10

42 U.S.C. § 1981(b)....................................................2, 8, 10, 11, 16, 17

42 U.S.C. § 1981a(b)(3) .......................................................................18

42 U.S.C. § 2000e-2(a)(1)................................2, 8, 10, 11, 16, 25

42 U.S.C. § 2000e-2(d) ........................................................................13

42 U.S.C. § 2000e-3(a).........................................................................25

42 U.S.C. § 2000e-5(f)(3).......................................................................2

42 U.S.C. § 2000e-5(g)(1) ........................................................................18

**Other Authorities**

EEOC Compliance Manual, § 613.1(a), 2006 WL 4672701 (2009) ..................13

EEOC Compliance Manual, § 613.1(b), 2006 WL 4672701 (2009) .................13

H. R. Rep. No. 102-40 (1991) ..............................................................16

Mississippi School Boards Association, About MSBA, MSBA
    Goals,
    https://www.msbaonline.org/AboutMSBA/MSBAGoals/tabi
    d/886/Default.aspx ..........................................................................22

Mississippi School Boards Association, Programs & Services,
    Superintendent Search,
    https://www.msbaonline.org/ProgramsServices/Su
    perintendentSearch/tabid/283/Default.aspx .................................................22

Mississippi School Boards Association, Prospective
    Superintendent Leadership Academy,
    https://www.msbaonline.org/ProgramsServices/Pros
    pectiveSuperintendentLeadership/tabid/549/Default.aspx...................4, 21

Webster's Third New International Dictionary (1961) ....................................12

**Introduction**

Plaintiff-Appellant Dr. LaRenda Harrison is an African-American school administrator and former school principal. Dr. Harrison maintains that her employer, Defendant-Appellee Brookhaven School District, violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 when it refused to pay the tuition for her to attend professional superintendent training because of her race and sex, although it had regularly paid for similarly situated white and male employees to attend the same training.

The district court assumed the truth of Dr. Harrison's allegations, as it was required to do on the school district's motion for judgment on the pleadings. Yet the court granted that motion, holding that because the school district's discriminatory conduct did not amount to an "ultimate employment decision," it was not actionable. ROA.135-37 (RE.16-18). To be clear: Under the district court's reasoning, if the school district's files contained a memo stating that it would pay to train men but not women, or employees of certain races or religions but not others, Title VII and Section 1981 would have nothing to say about it.

It's been nearly six decades since Title VII's enactment, and Section 1981 has been on the books for a century and half. Because these statutes "tolerate[] no … discrimination, subtle or otherwise," *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973), the district court's decision cannot be right. This Court should reverse.

## Jurisdictional Statement

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3). The district court entered a memorandum opinion and order on September 15, 2021, granting Defendant-Appellee Brookhaven School District's motion for judgment on the pleadings on all of Plaintiff-Appellant Dr. LaRenda Harrison's Title VII and Section 1981 claims. ROA.128-38 (RE.9-19). The district court issued a separate order of dismissal and final judgment on October 1, 2021, making the case final as to all claims and all parties. ROA.140-41 (RE.7-8). Dr. Harrison filed a notice of appeal on October 5, 2021. This Court has jurisdiction under 28 U.S.C. § 1291.

## Issue Presented

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against its employees "because of" their race, color, sex, religion, or national origin "with respect to" hiring, firing, compensation, and other "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides "[a]ll persons" in the United States "the same right" "to make and enforce contracts" as is "enjoyed by white citizens," including "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a), (b).

The issue presented is whether an employer that withholds reimbursement for professional training from an employee because of that employee's race or sex violates Title VII and Section 1981.

## Statement of the Case

### A.   Factual allegations

The following facts are taken from Plaintiff-Appellant LaRenda Harrison's complaint and its attachments. ROA.6-30 (RE.20-44). Because this appeal arises from a grant of a motion for judgment on the pleadings, Dr. Harrison's plausible factual allegations must be taken as true and viewed in the light most favorable to the non-moving party, Dr. Harrison. *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir. 2017).

Dr. Harrison is an African-American female educator employed by Defendant-Appellee Brookhaven School District. ROA.26 (RE.40). She holds a doctorate in education, ROA.26 (RE.40), and has been an educator since 1993, beginning as a high-school English teacher and later serving as an assistant principal and principal, ROA.26-27 (RE.40-41). When the current dispute arose, Dr. Harrison was the school district's Director of Alternative Education Services, ROA.26 (RE.40), supervised by the school district's superintendent, ROA.8 (RE.22).

Dr. Harrison aspires to be a school-district superintendent. She believes she has "the capacity, intelligence, and skill to further the aims of the district" and wishes to "help[] our children reach their greatest potential." ROA.22 (RE.36) (quoting Dr. Harrison's superintendent-training program application). Therefore, in March 2019, Dr. Harrison asked the school district's Deputy Superintendent Roderick Henderson and its Superintendent Ray Carlock if the school district would pay for her to attend

the Mississippi School Board Association's Prospective Superintendent Leadership Academy. ROA.7-8 (RE.21-22). The Leadership Academy is selective, accepting only 30 applicants each year.[1] It offers "a rigorous program of study," and participants must "agree to attend all scheduled sessions and to participate in planned activities." ROA.21 (RE.35). As explained in more detail below (at 21), the Mississippi School Board Association is instrumental not only in training future superintendents, but also in conducting searches to fill superintendent positions in the state's public schools.

Deputy Superintendent Henderson told Dr. Harrison "that if she got accepted" by the Leadership Academy, "the district would pay for the training." ROA.8 (RE.22). Dr. Harrison then promptly applied and was accepted into the Academy for the coming year. ROA.8 (RE.22). Dr. Harrison's March 28, 2019 application explained that while she had "completed doctrinal coursework in educational administration and served in various leadership capacities," additional training "dedicated solely to superintendent leadership" would be "a worthwhile and golden opportunity." ROA.22 (RE.36). The training, she added, would make her

---

[1] Mississippi School Boards Association, Prospective Superintendent Leadership Academy, https://www.msbaonline.org/ProgramsServices/ProspectiveSuperintendentLeadership/tabid/549/Default.aspx (last visited Dec. 8, 2021.

"even more marketable in seeking top level, district-wide opportunities." ROA.22 (RE.36). Consistent with Deputy Superintendent Henderson's promise, Dr. Harrison's application indicated that the school district would pay the tuition for her Leadership Academy training. ROA.19 (RE.33).

But "Superintendent Carlock reneged once he learned Dr. Harrison had been accepted into the program," refusing to pay the tuition. ROA.8 (RE.22). Superintendent Carlock then asserted that if Dr. Harrison were to wait two more years, the school district would pay for her to go to the Academy. ROA.12 (RE.26). Dr. Harrison's already-approved application, however, was for the Leadership Academy "Class of 2019-2020," and, as the Academy warned, unless the tuition was paid by July 31, 2019, Dr. Harrison would "forfeit [her] spot" in that class. ROA.29 (RE.43). Dr. Harrison thus felt she "then had to commit and pay to reserve my spot for the academy" because "the opportunity ha[d] presented itself now." ROA.12 (RE.26). So, Dr. Harrison paid the tuition that the school district had earlier promised to pay. ROA.12 (RE.26).

The school district had in the past paid the fees for "equally situated white employees" who had been accepted into the Leadership Academy. ROA.8 (RE.22). Similarly, three school-district employees, "who were all males, were compensated for attending the academy." ROA.12 (RE.26).

### B.  Dr. Harrison's suit and the decision below

**1.** After exhausting her EEOC remedies, ROA.7 (RE.21), ROA.12-16 (RE.26-30), Dr. Harrison sued the school district in the Southern District of Mississippi alleging violations of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Dr. Harrison maintained that the school district discriminated against her on the basis of race and sex by reneging on its promise to pay for training at the Leadership Academy. ROA.9-10 (RE.23-24). She alleged that the school district had paid for Leadership Academy training for similarly situated white and male school-district employees, ROA.8 (RE.22), ROA.12 (RE.26), explaining that she "had to pay the fees personally and request time from work to attend the training" because of the school district's revocation of its financial support. ROA.9 (RE.23). According to the district court, these "training expenses" came to about $2,000. ROA.128 (RE.9). Dr. Harrison's prayer for relief sought funding for career development training, compensatory and punitive damages, pre- and post-judgment interest, reasonable attorney fees, and all other appropriate relief. ROA.11 (RE.25).[2]

The school district answered the complaint, ROA.66-75 (RE.45-54), and then moved for judgment on the pleadings on all of Dr. Harrison's Title VII

---

[2] Dr. Harrison also alleged that the school district retaliated against her because of her prior EEOC activity. The district court dismissed Dr. Harrison's Title VII retaliation claim on the ground that it wasn't properly exhausted before the EEOC, ROA.134 (RE.15), and Dr. Harrison does not pursue the Title VII retaliation claim here.

and Section 1981 discrimination claims. ROA.79. Accepting all of Dr. Harrison's factual allegations, as the procedural posture required, the school district made only one argument: that the conduct alleged—what the school district characterized as the denial of "the opportunity to attend continuing professional education training"—did not amount to an "ultimate employment decision" and, thus, was not actionable under Title VII or Section 1981. ROA.84-85 (citing *Ferguson v. Takata Seat Belts, Inc.*, 2008 U.S. Dist. LEXIS 88416 (W.D. Tex. Oct. 21, 2008)). That is, the school district maintained that even if its decision to reverse course and refuse to pay for Dr. Harrison's training had been motivated by race or sex discrimination, and even assuming that it had paid for training for similarly situated white and male employees, it would not have violated Title VII and Section 1981.

**2.** The district court agreed with the school district. ROA.137 (RE.18). The court assumed the truth of Dr. Harrison's allegations, ROA.131 (RE.12), including necessarily that the denial of funding for Dr. Harrison's training was motivated by discrimination. The court ruled, however, that Dr. Harrison's claims were not actionable because "[i]n the Fifth Circuit, adverse employment actions include only 'ultimate' employment decisions." ROA.135 (RE.16) (citation omitted), meaning an "employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action." ROA.135-36 (RE.16-17) (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004)).

Turning to Dr. Harrison's specific allegations and relying heavily on a Seventh Circuit decision (which the district court mistakenly referred to as a "Fifth Circuit precedent," ROA.137 (RE.18)), the district court reasoned that because "an employer's failure to provide training does not constitute an adverse employment action in the context of Title VII, it is no surprise that an employer's decision to not pay or provide reimbursement for training is also not actionable." ROA.137 (RE.18) (citing *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001); *Benningfield v. City of Hous.*, 157 F.3d 369, 376-77 (5th Cir. 1998)). The district court thus granted the school district's motion for judgment on the pleadings. ROA.138 (RE.19).

## Standard of Review

"A district court's grant of a Rule 12(c) motion for judgment on the pleadings is reviewed de novo." *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir. 2017). In reviewing here the district court's grant of a judgment on the pleadings, this Court must "accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (quoting *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012)).

## Summary of Argument

**A.** The school district discriminated against Dr. Harrison because of her race and sex "with respect to" the "compensation, terms, conditions, or privileges" of her employment in violation of Title VII and Section 1981. 42 U.S.C. § 2000e-2(a)(1); *see also id*. § 1981(a), (b). The statutes' words make

8

unlawful any differential race- or sex-based treatment in employment. As this case comes to this Court—on the district court's grant of a motion for judgment on the pleadings—the school district violated Title VII and Section 1981 because it refused to compensate Dr. Harrison as it had promised, and it doled out the privilege of paid professional development in a discriminatory fashion—on the basis of Dr. Harrison's race and sex. Beyond the statute's text, the EEOC's interpretation of Title VII, Title VII's enactment record, and Congress's amendments to Title VII confirm this conclusion.

**B.** Under this Court's precedent, the school district's denial of compensation for Dr. Harrison's training—training that undeniably advances school administrators' careers—is actionable discrimination. By reneging on its promise to pay for Dr. Harrison's training, the school district denied Dr. Harrison compensation that her male and white colleagues received, causing her monetary harm. The district court mistakenly reached the opposite conclusion by misconstruing or ignoring this Court's Title VII decisions. In fact, this Court's training- and compensation-related Title VII cases demand reversal. *See, e.g., Alvarado v. Tex. Rangers*, 492 F.3d 605, 615 (5th Cir. 2007); *Brooks v. Firestone Polymers, LLC*, 640 F. App'x 393, 397 (5th Cir. 2016) (per curiam).

**Argument**

**On the facts pleaded, the school district discriminated against Dr. Harrison because of her race and sex with respect to the "compensation, terms, conditions, or privileges" of her employment in violation of Title VII and Section 1981.**

Dr. Harrison's pleadings show that the Brookhaven School District "discriminate[d] against" her "because of" her race and sex "with respect to the "compensation, terms, conditions, [and] privileges of [her] employment," 42 U.S.C. § 2000e-2(a)(1); *see id.* § 1981(a), (b), when it refused to pay for her professional training after promising to do so, imposing monetary injury and harm to Dr. Harrison's career. As we now show, the district court's contrary decision, granting the school district's motion for judgment on the pleadings, should be reversed.[3]

A.   **Dr. Harrison has alleged violations of Title VII and Section 1981 consistent with those statutes' ordinary meaning and applicable tools of statutory construction.**

**1.** As in any case of statutory construction, the analysis should begin with the statute's words. *United States v. Maturino*, 887 F.3d 716, 723 (5th Cir. 2018). The "[t]ext is the alpha and the omega of the interpretive process." *Id.* The

---

[3] This appeal seeks reversal on both Dr. Harrison's Title VII and Section 1981 discrimination claims. The liability standards for Title VII and Section 1981 are the same. *See, e.g., Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399 (5th Cir. 2021). Therefore, to avoid redundancy, except where a discussion of Section 1981 is independently relevant, we refer in the body of the argument to Title VII alone, as did the district court in analyzing Dr. Harrison's discrimination claims. *See* ROA.135 n.3 (RE.16 n.3).

statute's words here do not limit prohibited employer conduct to "adverse employment actions" or "ultimate employment decisions," but state only that employers may not "discriminate" because of race or sex "with respect to" the "compensation, terms, conditions, or privileges" of employment. 42 U.S.C. § 2000e-2(a)(1); *see also* 42 U.S.C. § 1981(b) (barring race discrimination in the "benefits, privileges, terms, and conditions of the contractual relationship").

Those words, taken together, "evince[] a congressional intent to strike at the *entire spectrum* of disparate treatment of men and women in employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (emphasis added) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Put differently, "compensation, terms, conditions, or privileges of employment" comprise all of "the 'incidents of employment' or [conduct] that form[s] 'an aspect of the relationship between the employer and employees.'" *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984) (citations and footnote omitted); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) (describing "terms, conditions, or privileges of employment" as the attributes of the employer-employee relationship that "affect employment or alter the conditions of the workplace").

Though "[i]t's not even clear that we need dictionaries to confirm what fluent speakers of English know," *Threat v. City of Cleveland*, 6 F.4th 672, 677 (6th Cir. 2021) (Sutton, J.), the definitions of the words "compensation,"

"terms," "conditions," and "privileges" contemporaneous with Title VII's enactment are, not surprisingly, confirmatory. As relevant here, "compensation" means "something that constitutes an equivalent or recompense" or "something that makes up for a loss." *Compensation*, Webster's Third New International Dictionary ("Webster's Third") 463 (1961). These definitions are especially salient here because, as explained in more detail in Part B below (at 26-27), Dr. Harrison was denied "recompense" and the school district failed to "make[] up for a loss," when it reneged on its promise to pay for her training (while paying for the same training for similarly situated white and male employees). ROA.8 (RE.22), ROA.12 (RE.26).

"Terms" are defined as "propositions, limitations, or provisions stated or offered for the acceptance of another and determining (as in a contract) the nature and scope of the agreement." *Terms*, Webster's Third 2358 (1961). A "condition" is "something established or agreed upon as a requisite to the doing or taking effect of something else." *Condition*, Webster's Third 473 (1961).

And, of particular relevance to Dr. Harrison's case, a "privilege" is "a peculiar right, immunity, prerogative, or other benefit." *Privilege*, Webster's Third 1805 (1961). Thus, even benefits that an employer "is under no obligation to furnish by any express or implied contract … may qualify as a 'privileg[e]' of employment under Title VII." *Hishon*, 467 U.S. at 75. For that

reason, then, a quintessential privilege—like the professional training and an employer's refusal to pay for that training at issue here—"may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all." *Id.*; *see also* 42 U.S.C. § 2000e-2(d) (Title VII provision making it an "unlawful employment practice" to discriminate "in admission to, or employment in, any program established to provide apprenticeship or other training").

**2.** The EEOC—the agency charged by Congress with interpreting and enforcing Title VII—has explained that "[i]n accordance with Congressional intent," Title VII's "terms, conditions, or privileges" language "is to be read in the broadest possible terms." EEOC Compliance Manual, § 613.1(a), 2006 WL 4672701 (2009). Thus, the EEOC explains, "[t]he phrase 'terms, conditions, and privileges' has come to include a wide range of activities or practices which occur in the work place." *Id.* Of special salience here, the agency has observed that an "[e]xample of disparate treatment" is when "White employees are uniformly granted educational leave, whereas similarly situated Black employees are seldom granted educational leave." *Id.* § 613.1(b). This longstanding EEOC guidance, based on an ordinary understanding of the statute's text, is entitled to judicial respect. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n.6 (2002) (EEOC interpretations entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

**3.** Title VII's enactment record underscores the breadth of "terms, conditions, or privileges of employment." Congress borrowed sweeping language from the National Labor Relations Act (NLRA) in drafting Title VII. *See Hishon*, 467 U.S. at 76 n.8. Like Title VII, Section 8(d) of the NLRA uses the phrase "terms and conditions," 29 U.S.C. § 158(d), connoting an expansive set of mandatory subjects of collective bargaining, including transfers, *e.g.*, *Gruma Corp.*, 350 NLRB 336, 336 (2007), work rules, *e.g.*, *Virginia Mason Hosp.*, 357 NLRB 564, 566 (2011), and safety practices, *e.g.*, *Public Serv. Co. of New Mexico*, 364 NLRB No. 86, slip op. at 5-6 (2016). Denial of compensation or any other monetizable work benefit is thus not required to constitute "terms and conditions" of employment.

Even closer on point, NLRA Section 8(a)(3) makes unlawful "discrimination in regard to … any term or condition of employment" to encourage or discourage membership in a labor organization. 29 U.S.C. § 158(a)(3). Employers can violate this provision by causing even "comparatively slight" changes to employee "terms and conditions." *Randall, Div. of Textron, Inc. v. NLRB*, 687 F.2d 1240, 1249 (8th Cir. 1982); *see also, e.g.*, *Wendt Corp.*, 369 NLRB No. 135, slip op. at 3, 17 (2020) (finding discriminatory the employer's reassignment of a welder to work using a saw, despite no change in compensation). "[T]here is little doubt," for instance, that even a one-day transfer *with no loss of pay or benefits* is a "term or condition" under the NLRA. *Microimage Display Div. of Xidex Corp. v.*

*NLRB*, 924 F.2d 245, 252 (D.C. Cir. 1991). And of particular relevance here, when motivated by discrimination, "[d]enying employees compensation and fees to attend training classes" unlawfully alters terms and conditions of employment under Section 8(a)(3). *St. Francis Hosp.*, 263 NLRB 834, 852, 853 (1982); *see also, e.g., Success Village Apartments, Inc.*, 347 NLRB 1065, 1074, 1111 (2006) (holding that an employer's refusal "to provide asbestos awareness training" violated Section 8(a)(3)).[4]

**4.** Congressional action in the decades since Title VII's 1964 enactment shows that that district court was wrong in suggesting that the statute reaches only pocketbook or other immediately monetizable harms. *See* ROA.135-36 (RE.16-17).

**a.** *First*, consider Congress's response to the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989). There, a Black woman challenged "the conditions of her employment," *id.* at 179, under the then-existing version of 42 U.S.C. § 1981, which prohibited "racial discrimination

---

[4] For other examples of "terms and conditions" under NLRA Section 8(a)(3) that go well beyond monetizable harm, see *Advertiser's Mfg. Co.*, 280 NLRB 1185, 1190-91 (1986), *enforced*, 823 F.2d 1086 (7th Cir. 1987) (removing telephone privileges violated NLRA's antidiscrimination provision); *Goodman Inv. Co.*, 292 NLRB 340, 340, 349 (1989) (eliminating an employee's free parking space constituted unlawful discrimination); *Mid-South Bottling Co.*, 287 NLRB 1333, 1342-43 (1988), *enforced*, 876 F.2d 458 (5th Cir. 1989) (refusal to allow an employee to borrow a dolly for personal use was discrimination in the terms and conditions of employment); *F & R Meat Co.*, 296 NLRB 759, 767 (1989) (depriving employees of "the free coffee they had previously enjoyed" constituted unlawful discrimination).

in the making and enforcement of private contracts," *id.* at 171 (quoting *Runyon v. McCrary*, 427 U.S. 160, 168 (1976)). She was hired as a teller and file coordinator but was assigned tasks like "sweeping and dusting," which her employer did not impose on her white colleagues. *Id.* at 178.

According to the Court, this discrimination was not actionable under Section 1981 only because it did not abridge Patterson's right to make or enforce contracts but rather involved "postformation conduct." *Patterson*, 491 U.S. at 180. As relevant here, the Court concluded that although the employer's conduct would have been "actionable under the more expansive reach of Title VII of the Civil Rights Act of 1964" because of its prohibition on discrimination in an employee's "terms, conditions, or privileges of employment," *id.*, the employer was free, under Section 1981, to impose "discriminatory working conditions" during the performance of Patterson's contract, *id.* at 177; *see also id.* at 180.

In response, "Congress promptly repudiated that interpretation" of Section 1981 in the Civil Rights Act of 1991. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1021 (2020) (Ginsburg, J., concurring). Because "the Court's interpretation … crippled the statute's deterrent value and left millions of workers without federal protection against employment discrimination," H. R. Rep. No. 102-40, pt. 1, at 92 (1991), Congress amended Section 1981 to expressly parallel Title VII. *Compare* 42 U.S.C. § 1981(b) *with* 42 U.S.C. § 2000e-2(a)(1). Section 1981 now prohibits discrimination not only

in making and enforcing contracts but, like Title VII, also in "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

Put differently, Congress's mechanism for expanding Section 1981 to cover discriminatory work assignments was to add three of the words at issue here—"terms," "conditions," and "privileges"—to the statute. It is clear, then, that Congress agreed with the Supreme Court's view that Title VII's "expansive" "terms, conditions, or privileges of employment" would have covered Patterson's claim, which was "plain[ly]" a challenge to "the conditions of her employment," *Patterson*, 491 U.S. at 179—even though those conditions did not cause immediate monetary harm or concern the type of "benefits" that the district court believed were required to make Dr. Harrison's claims actionable. *See* ROA.135-36 (RE.16-17). Dr. Harrison's claims—which are brought under both Title VII *and* Section 1981 (*see supra* note 3)—are, therefore, the very types of claims that Congress thought of as actionable when it overruled *Patterson*.

**b.** *Second*, in the 1991 Civil Rights Act, Congress expanded the monetary relief available to disparate-treatment plaintiffs, such as Dr. Harrison, by amending Title VII to authorize compensatory and punitive damages. Prior to 1991, plaintiffs could recover monetary relief only for discriminatory workplace practices that were "also found to have some concrete effect on the plaintiff's employment status, such as a denied promotion, a differential

in compensation, or termination." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 254 (1994). But, with the changes in the 1991 Act, a plaintiff could, regardless of whether she had suffered quantifiable, compensation-related injury, recover compensatory awards for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3).

"[T]he new compensatory damages provision" was "in addition to," and did "not replace or duplicate," the previously available remedies for backpay and lost fringe benefits like vacation pay and pension benefits or the other equitable remedies available for discrimination affecting terms, conditions, or privileges of employment. *See Landgraf*, 511 U.S. at 253. Today, a plaintiff can recover damages "in circumstances in which there has been unlawful discrimination in the 'terms, conditions, or privileges of employment' even though the discrimination did not involve a discharge or a loss of pay." *Id.* at 254 (citation omitted); *see id.* at 254 n.7 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In other words, the 1991 amendments underscored that plaintiffs like Dr. Harrison may obtain retrospective relief even when a discriminatory denial of training is not accompanied by a pay-related detriment or predictable monetary harm. *Id.* at 254.

Notably, the 1991 Act made these changes without disturbing the statute's existing injunctive remedies for these same types of non-monetizable injuries, 42 U.S.C. § 2000e-5(g)(1) (empowering courts to grant

"any other equitable relief as the court deems appropriate"), which had always covered situations involving the types of terms, conditions, and privileges at issue here. So, prior to 1991, if an employer had a policy of considering requests for paid training from white, male employees only, a district court surely would have had the power to enjoin that policy at the time of Title VII's enactment. *See, e.g.*, *Bing v. Roadway Express, Inc.*, 485 F.2d 441, 448 (5th Cir. 1973) (disparate-impact decision affirming an injunction against employer's no-transfer rule because it operated to Black employees' detriment and thus violated Title VII).

Though Dr. Harrison has alleged compensation-related discrimination, *see supra* at 3-5, 12; *infra* at 26-27, the 1991 Act's amendments show that the district court erred in suggesting that a Title VII plaintiff must show monetizable harm. *See* ROA.135-36 (RE.16-17). This Court should reverse on that basis alone.

 **B.** **Dr. Harrison's discrimination claims are actionable under this Court's precedent concerning training and employee compensation.**

 **1. Dr. Harrison's claims are actionable under this Court's training-related precedent.** The district court erred by holding that the school district's refusal to pay for Dr. Harrison's training was not actionable under this Court's case law. To be sure, this Court has held in some cases— wrongly, in our view—that an employer's discriminatory failure to train on the basis of a Title VII protected characteristic, without more, is not

actionable under Title VII. *See, e.g., Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 406-07 (5th Cir. 1999). But a claim that an employer was motivated by discrimination in failing to train an employee employer *is* actionable under Title VII when the plaintiff can show more than "potential, tangential effect on increased compensation." *See Brooks v. Firestone Polymers, LLC*, 640 F. App'x 393, 397 (5th Cir. 2016) (per curiam).

**a.** By contrast to decisions like *Shackelford* and *Brooks*, Dr. Harrison's claim does not rest on a mere "potential, tangential effect on increased compensation" resulting from a failure to train. Dr. Harrison *did* receive training, but at her own expense, after the school district promised to pay for and then reneged. *See supra* at 3-5, 12 (describing Dr. Harrison's monetary harm). The school district's broken promise directly affected Dr. Harrison's compensation, causing her immediate monetary harm, and that is a key basis for her claim.

In any case, even if (counterfactually) we were to assume away the broken promise to pay for Dr. Harrison's training, the facts alleged here, construed in her favor as they must be, show far more than the kind of non-actionable speculative "effect on increased compensation" referred to in *Brooks*, 640 F. App'x at 397. Dr. Harrison maintains that she sought to attend the Mississippi School Board Association's Prospective Superintendent Leadership Academy in part because it was "a worthwhile and golden opportunity," ROA.22 (RE.36), that would make her "more marketable in

seeking top level, district-wide opportunities," ROA.22 (RE.36)—that is, she wanted the training because it would lead to more lucrative jobs within the school district.

In the context of the allegations here, the *Prospective Superintendent Leadership Academy* is not any old training. Dr. Harrison is a lifelong educator who had already served as a principal and in other positions of managerial leadership. She seeks to become a *superintendent*, a role at the top of the public-education pyramid and (presumably) at the top of any school district's pay scale. In the Academy's words, its training is the opposite of general continuing education. Rather, it is "designed to prepare potential candidates for superintendent positions in Mississippi's public schools," "provid[ing] intensive in-depth preparation for the challenging job of being a public school superintendent."[5] Acceptance into the program is selective and results in "certification from the Academy's review board."[6]

In this regard, Dr. Harrison's quest to be a superintendent and to acquire training to that end is similar to the situation in *Alvarado v. Texas Rangers*, 492 F.3d 605 (5th Cir. 2007). There, the plaintiff, a law-enforcement officer, maintained that she was denied a transfer because of her sex. *Id.* at 609. The

---

[5] Mississippi School Boards Association, Prospective Superintendent Leadership Academy, https://www.msbaonline.org/ProgramsServices/Pros pectiveSuperintendentLeadership/tabid/549/Default.aspx (last visited Dec. 8, 2021).

[6] *Id.*

new position involved no increase in pay. *Id.* at 615. But this Court nevertheless held that the district court erred in granting summary judgment on no-adverse-employment-action grounds because the job was "one of the most competitive goals to which a law enforcement officer may aspire," the selection process was competitive, and the job involved "less supervision and ha[d] greater job responsibilities." *Id.*

Moreover, Dr. Harrison's superintendent training was not sponsored by any old continuing-education company, but by the *Mississippi School Boards Association*, whose stated "mission" includes "leadership training" and whose first-listed goal is to "serve as Mississippi's primary resource for school board leadership."[7] To that end, the Association conducts searches for school boards seeking superintendents in Mississippi's public schools, touting its "vast experience" and "unique knowledge" in that realm.[8] In other words, the training involved here is aimed at placing people in the top executive position in school-district administration, and it is run by the people that can make a prospective superintendent's dream job come true.

---

[7] Mississippi School Boards Association, About MSBA, MSBA Goals, https://www.msbaonline.org/AboutMSBA/MSBAGoals/tabid/886/Default.aspx (last visited Dec. 8, 2021).

[8] Mississippi School Boards Association, Programs & Services, Superintendent Search, https://www.msbaonline.org/ProgramsServices/SuperintendentSearch/tabid/283/Default.aspx (last visited Dec. 8, 2021); *see id.* (noting that "MSBA is the Premier Superintendent Search Service in Mississippi").

In sum, Dr. Harrison's allegations that Leadership Academy training was a "golden opportunity" that would make her "more marketable," ROA.22 (RE.36), must be credited given the Academy's unmistakable career-enhancing attributes. And in light of Dr. Harrison's lengthy history as an educator, principal, and educational administrator, and her doctorate in education, ROA.26-28 (RE.40-42), the training at issue here was tethered realistically to her future advancement and increased pay. Dr. Harrison's interest in receiving the Academy's training, then, was not some "idiosyncratic preference," but part of an objectively reasonable plan to become a superintendent. *Alvarado*, 492 F.3d at 615. Her claim is therefore actionable under this Court's failure-to-train precedent.

**b.** The district wrongly held otherwise. In seeking to square the precedent with Dr. Harrison's claim, the district court deduced that if a failure to train does not constitute an adverse employment action, an employer's failure to reimburse a plaintiff for training expenses could not be an adverse employment action either. ROA.137 (RE.18). As already explained (at 3-5, 12), that reasoning is incorrect because the school district imposed monetary harm on Dr. Harrison when it promised to pay for Dr. Harrison training and then reneged.

In any event, in arriving at its mistaken conclusion, the district court cited two decisions that have no bearing on the situation here (and, notably, that the school district did not even cite in moving for judgment on the pleadings,

*see* ROA.84-86). The court relied on *Fyfe v. City of Fort Wayne*, 241 F.3d 597 (7th Cir. 2001), in which the Seventh Circuit (again, not the Fifth Circuit, as the district court mistakenly believed, *see* ROA.137 (RE.18)), held that the employer's refusal to reimburse the plaintiff for travel expenses related to a seminar was not a retaliatory adverse employment action because the non-reimbursement decision was "purely discretionary." *Fyfe*, 241 F.3d at 602-03. The court noted that the record did not "reflect the regularity with which City employees attend seminars, and the regularity with which their expenses are reimbursed." *Id.* at 602.

We stress that *Fyfe* is not binding here. And if it were, even a supposedly "purely discretionary" decision like that one at issue in *Fyfe* is unlawful when motivated by discrimination. After all, as explained above (at 12-13, 24), that is why Title VII prohibits discrimination in the "privileges" of employment—that is, an employer need not pay for training, but when it denies that support because of discrimination, it has violated Title VII. *See Hishon*, 467 U.S. at 75.

In any case, *Fyfe* is nothing like the situation here. First of all, unlike the employer in *Fyfe*, the school district here reneged on its promise to pay only after conditioning that promise on Dr. Harrison's acceptance into the training program and intention to attend—that is, even after purporting to cabin its own discretion.

Second, as noted, *Fyfe* was a retaliation case, and, thus, did not present the question whether a failure to reimburse motivated by discriminatory animus is actionable as conduct "with respect to" "compensation, terms, conditions, or privileges of employment" under Title VII's disparate-treatment provision, 42 U.S.C. § 2000e-2(a)(1); *compare* 42 U.S.C. § 2000e-3(a) (Title VII's retaliation provision, which makes no mention of "compensation, terms, conditions, or privileges of employment").

Finally, and perhaps most importantly, Dr. Harrison alleges that, historically, the school district paid for similarly situated white and male employees to attend the Leadership Academy, thus "reflect[ing]" a good deal about "the regularity with which [school district] employees attend seminars, and the regularity with which their expenses are reimbursed," *Fyfe*, 241 F.3d at 602, again underscoring here the lack of "purely discretionary" conduct of the kind that motivated the Seventh Circuit in *Fyfe*.

*Benningfield v. City of Houston*, 157 F.3d 369 (5th Cir. 1998)—cited by the district court for the proposition that an employer's failure to reimburse travel expenses is an "administrative matter" and thus not actionable under Title VII, RE.18 (ROA.137)—is even further afield. To begin with, *Benningfield* concerned whether an employer's failure to reimburse an employee for travel expenses after she engaged in speech amounted to unlawful *retaliation* under *the First Amendment*, *see Benningfield*, 157 F.3d at 374, which has nothing to do with whether an employee's training (or an

employer's failure to pay for training) is a "term, condition, or privilege" of employment under Title VII. Further, in *Benningfield*, there was no indication that the employer promised the employee reimbursement for her travel expenses and later reneged, causing the kind of monetary harm alleged here. *Id.* at 376.

**2. Dr. Harrison's claims are actionable under this Court's precedent concerning employee compensation.** This Court has held that an employer's discriminatory denial of a pay raise, no matter how small, constitutes an adverse employment action because it affects an employee's compensation. *See, e.g., Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001) (rejecting the employer's argument that a "simple failure to receive a modest increase in pay," did not constitute an "ultimate employment decision" because, regardless of the pay increase's size, the plaintiff's compensation was negatively affected from the denial of the raise); *Rubinstein v. Admin'rs. of the Tulane Educ. Fund*, 218 F.3d 392, 402 (5th Cir. 2000) (upholding a jury verdict that the employer unlawfully retaliated against the plaintiff in denying him a pay raise).

Like the employee's alleged entitlement to a "merit pay increase … that had been recommended by her immediate supervisor" in *Fierros*, 274 F.3d at 189, Dr. Harrison was allegedly entitled to the reimbursement for training that had been approved by the school district prior to her applying to Leadership Academy. Further, the school district's denial of reimbursement

after previously promising to pay (and approving her attendance at the training), directly eroded Dr. Harrison's compensation because, again like the employee in *Fierros*, *see id.* at 194, Dr. Harrison would have netted more money but for the school district's discriminatory denial of reimbursement. Finally, as in *Fierros*, the relief that Dr. Harrison seeks includes "relief from the denial" of the reimbursement itself, as the district court noted, ROA.128 (RE.9), "not from any employment action that the pay increase denial might lead to," *Fierros*, 274 F.3d at 194—a classic "ultimate employment action" under this Court's precedent.

## Conclusion

This Court should reverse the district court's judgment on Dr. Harrison's Title VII and Section 1981 discrimination claims and remand for further proceedings on the merits.

Respectfully submitted,

/s/ Brian Wolfman
Brian Wolfman
Madeline Meth
GEORGETOWN LAW APPELLATE
 COURTS IMMERSION CLINIC
600 New Jersey Ave., NW, Suite 312
Washington, D.C. 20001
(202) 661-6582

Counsel for Plaintiff-Appellant La Renda Harrison

December 8, 2021

**Certificate of Service**

I certify that, on December 8, 2021, this brief was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.

<u>/s/ Brian Wolfman</u>
Brian Wolfman

Counsel for Plaintiff-Appellant


**Certificate of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,173 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Palatino Linotype.

<u>/s/ Brian Wolfman</u>
Brian Wolfman

Counsel for Plaintiff-Appellant